## The Hudson.

*(District Court, W. D. Pennsylvania.* ——, 1881.)

1. Seamen—Contract—Implied Terms.

Where there are no shipping articles, and no express understanding to the contrary, it is the implied contract that deck hands shipped on an Ohio river packet engaged in the Pittsburgh and Cincinnati trade are to be returned to their several ports of shipment.

A packet in this trade shipped hands at Cincinnati and other points above, in Ohio, Kentucky, and West Virginia, and proceeded to Pittsburgh, and there the hands were put off the boat, the river having then frozen over and navigation, by reason of ice, remaining suspended for eight days.

*Held,* that the boat should either have kept the hands on board and furnished them with food until navigation was resumed, or provided them with means to reach their ports of shipment.

*Held, further,* that the hands were entitled to a decree for traveling costs and expenses, as of the date of their discharge, from Pittsburgh to their several ports of shipment, by the ordinary routes of travel then open, and also wages at the contract rate during the time required to reach said points.

In Admiralty.

*George C. Wilson,* for libellants.

*Isaac S. Van Voorhis,* for respondents.

Acheson, D. J. The libellants, who are 16 in number, were hired, some on the 28th and others on the 30th and 31st days of January last, as deck hands upon the steamboat Hudson, a weekly packet in the Pittsburgh and Cincinnati trade. Two of the libellants

shipped on the Hudson at Cincinnati; four at Maysville, Kentucky; three at Huntingdon, West Virginia; five at Gallipolis, Ohio; and two at Parkersburgh, West Virginia. When running, the Hudson is once a week at Pittsburgh and Cincinnati, and twice a week at the intermediate points above named. The libellants claim that they were respectively hired at the rate of $25 per month for a round trip from and back to their several places of shipment. There is direct evidence tending to show that many of them were so hired. The respondents, however, deny that the hiring was for a round trip in the case of any of the libellants, and claim that when the boat was unloaded at Pittsburgh they had the right to pay off and dismiss the crew. But they do not pretend that the libellants' terms of service then expired by express contract. There were no shipping articles, and the respondents' own evidence is that when the libellants were hired nothing was said as to the duration of their service. The boat reached Pittsburgh February 3d, and on that day, after the cargo was unloaded, the libellants were paid off and discharged. The river was then frozen over, and navigation between Pittsburgh and Cincinnati remained suspended on account of ice for a period of eight days.

If there was here no express agreement as to the time of service, what would the law imply under the circumstances? This subject is discussed by Judge Treat, of the eastern district of Missouri, in the well-considered case of *Worth* v. *Lioness*, 11 Pittsb. Leg. J. (N. S.) 187. It is there declared that where there are no shipping articles, and no prescribed voyage stated, the implied contract or legal presumption, when a mariner is shipped, is that he is to be returned to the port of shipment, and that the rule applies as well to internal as to ocean navigation. It is true, the Lioness was a tow-boat, engaged in towing coal on the Ohio and Mississippi rivers, while the Hudson is an Ohio river packet, plying between Pittsburgh and Cincinnati. But this difference in the nature of their employment and character of their voyages is, I think, immaterial. The rule as stated by Judge Treat is a most reasonable one, and is applicable to the circumstances of the present case. When these libellants respectively shipped on the Hudson, it was undoubtedly in the contemplation of all parties that the boat would return, according to the ordinary course of the trade in which she was engaged, to the various places of shipment, and the libellants had a right to assume, in the absence of express notification to the contrary, that they would be brought back. If they had been informed that they were liable, in case navigation should unexpectedly close, to be put off the Hudson at Pittsburgh without

means to return to their homes, is it likely that a man of them would have shipped on her? Says Judge Treat, in the case of *The Lioness, supra:*

"It is very easy for officers to state to a mariner definitely what his employment is to be—whether to be discharged at the port of arrival or otherwise—if they wish to limit his term of service, or reserve a right to discharge him before his return to the port of shipment."

The humanity of the rule which requires the mariner to be returned to his port of shipment, in the absence of an understanding to the contrary, is well illustrated by what befel these libellants. When they were turned off the Hudson into the streets of Pittsburgh the weather was bitter cold. Some of them were insufficiently clad; none of them had money enough to take them to their distant homes. They were total strangers in a great city, and soon penniless. In their extremity some of them were compelled to seek refuge at night in the city lock-up, where, in charity, they were permitted to lodge.

It is claimed that, having received their wages and quit the boat, the libellants thereby waived any further rights they may have had; but, in view of all the facts, I think no waiver is shown. They were virtually expelled from the boat, and this without justification. Clearly, under the circumstances, the officers of the Hudson were bound, either to keep the libellants upon the boat and provide them with food until the boat resumed navigation, or else furnish them with means to return to their several places of shipment. The libellants, therefore, will be allowed, respectively, traveling costs and expenses, as of the date of their discharge, from Pittsburgh to their several places of shipment, by the ordinary routes then open, and also wages at the contract rate for the time required to reach said places; and the case is recommitted to the commissioner to ascertain and report the several amounts coming to the libellants under the rule of compensation indicated.